1  MARK POE (S.B. #223714)
     mpoe@gawpoe.com
2  RANDOLPH GAW (S.B. #223718)
     rgaw@gawpoe.com
3  SAMUEL SONG (S.B. #245007)
     ssong@gawpoe.com
4  VICTOR MENG (S.B. #254102)
5    vmeng@gawpoe.com
   GAW | POE LLP
6  4 Embarcadero, Suite 1400
   San Francisco, CA 94111
7  Telephone: (415) 766-7451
8  Facsimile: (415) 737-0642

9  Attorneys for Plaintiffs

REDACTED PURSUANT TO
ORDER OF THE COURT
DATED NOVEMBER 6, 2018

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.A. INTERNATIONAL CORP., MANHATTAN WHOLESALERS INC., EXCEL WHOLESALE DISTRIBUTORS INC., VALUE DISTRIBUTOR, INC., BORDER CASH & CARRY, INC., AKR CORPORATION, U.S. WHOLESALE OUTLET & DISTRIBUTION, INC.; SANOOR, INC. (d/b/a L.A. TOP DISTRIBUTOR); PITTSBURG WHOLESALE GROCERS, INC.; and PACIFIC GROSERVICE, INC.<br><br>Plaintiffs,<br><br>v.<br><br>PRESTIGE BRANDS HOLDINGS, INC. and MEDTECH PRODUCTS INC.<br><br>Defendants. | Case No. 2:18-cv-06809-DPP(MRWx)<br><br>**AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

- 1 -

AMENDED COMPLAINT
CASE NO. 2:18-CV-06809-DPP(MRWx)

Plaintiffs L.A. International Corp., Manhattan Wholesalers Inc., Excel Wholesale Distributors Inc., Value Distributor, Inc., Border Cash & Carry, Inc., AKR Corporation, U.S. Wholesale Outlet & Distribution, Inc., Sanoor, Inc. (d/b/a L.A. Top Distributor), Pittsburg Wholesale Grocers, Inc., and Pacific Groservice, Inc. (together, "Plaintiffs") allege as follows:

## JURISDICTIONAL STATEMENT

1. The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because some of Plaintiffs' claims arise under federal law.

2. The Court has supplemental jurisdiction of Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Plaintiffs L.A. International Corp., Value Distributor, Inc., U.S. Wholesale Outlet & Distribution, Inc., Sanoor, Inc. (d/b/a L.A. Top Distributor), Pittsburg Wholesale Grocers, Inc., and Pacific Groservice, Inc. are citizens of California. Plaintiffs L.A. International Corp., Value Distributor, Inc., U.S. Wholesale Outlet & Distribution, Inc., and Sanoor, Inc. (d/b/a L.A. Top Distributor) all have their principal places of business in this district.

## INTRODUCTION

4. The federal Robinson-Patman Act, 15 U.S.C. § 13 (the "RPA"), makes it illegal for a manufacturer (known in RPA parlance as a "supplier") to charge higher prices to "disfavored" customers, while charging lower prices to "favored" customers, where those two sets of customers are in competition with each other. This illegal conduct is known in antitrust law as "price discrimination." As the Supreme Court explained in the seminal RPA precedent of *FTC v. Morton Salt Co.*:

> The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability. The

> Robinson-Patman Act was passed to deprive a large buyer of such advantages except to the extent that a lower price could be justified by reason of a seller's diminished costs due to quantity manufacture, delivery or sale, or by reason of the seller's good faith effort to meet a competitor's equally low price.

334 U.S. 37, 43 (1948).

5. In this case, Defendants Prestige Brands Holdings, Inc. and Medtech Products Inc. (together, "Medtech") are the suppliers of the popular Clear Eyes Brand eyedrops, which provide "relief from irritation, redness, burning and mild dry eyes." For years, Medtech has continuously violated the RPA by selling Clear Eyes to the giant wholesalers Costco Wholesale Corporation and Sam's Club at prices that are far lower than the prices Medtech charged to those giants' competitors, among whom are the plaintiffs in this case.

6. Plaintiffs compete directly with Costco and Sam's Club for sales of Clear Eyes to convenience stores and other retail outlets, as well as to other small wholesalers who are not on direct with Medtech. Plaintiffs have lost millions of dollars in Clear Eyes sales over the preceding four years, as a result of Medtech's illegal discrimination.

7. Plaintiffs bring this action to recover those damages, and to obtain an injunction prohibiting further price discrimination against them.

**STATUTORY BACKGROUND**

8. The federal Robinson-Patman Act, 15 U.S.C. § 13, was enacted because Congress considered it to be an evil that some buyers of commodities could secure a competitive advantage through receiving special prices, discounts, rebates, allowances or other forms of price discrimination offered by the seller that were not made available to other buyers.

9. In particular, Congress was concerned that large corporations could take advantage of their greater purchasing power to demand specially discounted

pricing from suppliers, and leverage that advantage to undercut and drive out of business the local, community-based businesses with whom they compete. As the last fifty years of American commerce have shown, this concern was well-founded.

10. Accordingly, the Robinson-Patman Act forbids all sellers from discriminating in price among different purchasers of commodities of like grade and quality, where those sales are made in interstate commerce.

11. The California state legislature similarly viewed with concern the impact that a large corporation's ability to demand (and a manufacturer's willingness to grant) exclusive, favorable pricing would have on competition between giant purchasers and the local, community-based businesses with whom those giants compete.

12. As a result, the California state legislature passed the Unfair Practices Act, Cal. Bus. & Prof. Code § 17045, which forbids a seller from secretly offering rebates, allowances, commissions or other unearned discounts to some buyers, to the exclusion of other buyers.

13. At the heart of both the Robinson-Patman Act and the Unfair Practices Act is the recognition that small businesses are a critical and necessary component of the American economy. Their continued existence and vitality provides healthy competition to large chains, to the benefit of all consumers. As eloquently stated by Representative Wright Patman, the eponymous sponsor of the Act:

> In the field of merchandise distribution a Goliath stands against divided forces, plying a powerful weapon with a skillful hand against the vulnerable weaknesses of his opponents. The Goliath is the huge chain stores sapping the civic life of local communities with an absentee overlordship, draining off their earnings to his coffers, and reducing their independent business men to employees or to idleness.

*Remarks of Rep. Wright Patman introducing H.R. No. 8442*, 79 Cong. Rec. 9077 (June 11, 1935). One need look no further than the managerial staff of the favored customers at issue here—Costco Wholesale Corporation and Sam's Clubs—to find numerous examples of former "independent business men," who have lost their businesses due to unfair competition, and thereby been reduced to mere employees of these Goliaths. Nor need one look further than Costco and Sam's Club to witness firsthand "huge chain stores sapping the civic life of local communities with an absentee overlordship."

14. Other supporters explained that among the RPA's express purposes is the protection of small businesses. That goal was not rooted in charity, however. It was rooted in what Congress perceived as the importance of small businesses to the fabric of American society:

> [The purpose] is not to protect an individual, it is not to give the little fellow more money, it is not to take something from somebody else, but it is to build strong again the foundation of our Government and our civilization. That is the job presently before us. You cannot have it with a few great economic overlords to whom everybody else owes economic allegiance. . . The American people are not going to stand for a few lords of industry destroying this country [Applause].

*Remarks of Rep. Sumners, Debate in the House of Representatives on H.R. No. 8442*, 80 Cong. Rec. 8109 (May 27, 1936). Plaintiffs are among those Americans who will not stand for it, and bring this lawsuit accordingly.

15. Plaintiffs are exactly the type of local, family-owned businesses that Congress and the California state legislature sought to protect with the Robinson-Patman Act and the Unfair Trade Practices Act. They are small to mid-size wholesale food and sundry good distribution companies that supply products to local, independent businesses such as groceries, convenience stores, and gas stations that are bypassed by large vendors. The favored customers, Costco

Wholesale Corporation and Sam's Club, compete with Plaintiffs for that same segment of business. In particular, the division of Costco known as Costco Business Centers has previously given Rule 30(b)(6) testimony acknowledging that it specifically targets small "mom and pop" retail convenience stores as its main customer group—the exact customers targeted by Plaintiffs.

## HARM TO COMPETITION

16. The Robinson-Patman Act's purpose of protecting competition by means of protecting individual competitors makes it unique among the federal antitrust laws. Indeed, such harm is sufficiently demonstrated by proof of harm to the disfavored businesses themselves:

> We agree with Judge Mikva and the Third Circuit. We are persuaded that the language that the Robinson-Patman Act added to § 2(a) of the Clayton Act — "to injure, destroy, or prevent competition" — expresses Congressional intent to protect individual competitors, not just market competition, from the effects of price discrimination. As we said in *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1446 n. 18 (9th Cir.1995) (dicta), "[t]he purpose of this passage was to relieve secondary-line plaintiffs — small retailers who are disfavored by discriminating suppliers — from having to prove harm to competition marketwide, allowing them instead to impose liability simply by proving effects to individual competitors." *See also* 3 Earl W. Kintner & Joseph P. Bauer, *Federal Antitrust Law* §§ 19.2, 22.4 (1983) (addition of phrase "to injure, destroy, or prevent competition with any person" was to expand protection of original Clayton Act to individual competitors).

*Chroma Lighting v. GTE Products Corp.*, 111 F.3d 653, 657 (9th Cir. 1997). The *Chroma Lighting* court summarized: "We hold that in a secondary-line Robinson-Patman case, the *Morton Salt* inference that competitive injury to individual buyers harms competition generally may not be overcome by proof of no harm to competition." *Id.* at 658.

17. The precedent notwithstanding, the competitive landscape and individual consumers themselves have *also* been harmed by Medtech's illegal price

discrimination. The discriminatorily high prices charged to Plaintiffs were necessarily passed on (at least in part) to their retail-store customers. Those retail-store customers thus necessarily paid more for the same inventory than they would have paid had Medtech not discriminated against Plaintiffs. In turn, those retailers necessarily passed along at least part of that increased costs to the individual Clear Eyes consumers who patronized those stores. Had Medtech complied with the Robinson-Patman Act and California law, those consumers would have paid similarly low prices for Clear Eyes at their local corner store, regardless of whether that store owner sourced its inventory from Plaintiffs, or from Costco or Sam's.

18. Plaintiffs are entitled to treble damages, restitution, and injunctive relief for the discrimination levied against them by Medtech.

**PARTIES**

19. Plaintiff L.A. International Corp. is a California corporation with its principal place of business in Los Angeles County, California.

20. Plaintiff Manhattan Wholesalers Bronx Corp. is New York corporation headquartered in Bronx, New York.

21. Plaintiff Excel Wholesale Distributors Inc. is a New York corporation headquartered in Queens, New York.

22. Plaintiff Value Distributor, Inc. is a California corporation with its principal place of business in Los Angeles County, California.

23. Plaintiff Border Cash & Carry, Inc. is a Texas corporation headquartered in San Antonio, Texas.

24. Plaintiff AKR Corporation is a New York corporation headquartered in Brooklyn, New York.

25. Plaintiff Sanoor, Inc. is a California corporation that does business as L.A. Top Distributor, with its principal place of business in Los Angeles County, California.

26. Plaintiff U.S. Wholesale Outlet & Distribution, Inc. is a California corporation with its principal place of business in Los Angeles County, California.

27. Plaintiffs Pittsburg Wholesale Grocers, Inc. and Pacific Groservice, Inc. do business as "Pitco." They are California corporations with their principal place of business in Santa Clara County, California.

28. Defendant Prestige Brands Holdings, Inc. is a publicly traded Delaware corporation with its principal place of business in Tarrytown, New York. Prestige Brands Holdings is a holding company that markets and distributes over-the-counter healthcare and household cleaning products, including Clear Eyes.

29. Defendant Medtech Products Inc. is New York corporation with its principal place of business in Westchester County, New York. It is a 100% owned subsidiary of Defendant Prestige Brands Holdings, Inc. Medtech is the corporate name that appears on sales invoices of Clear Eyes to Plaintiffs.

## FACTUAL ALLEGATIONS

### Plaintiffs' Wholesale Business

30. Plaintiffs are in the business of purchasing food, beverages and consumer products from various companies and then reselling those products on a wholesale basis to retail outlets or other smaller wholesalers who are not on direct-purchaser status with a given supplier.

31. Plaintiffs purchase large volumes of food, beverages, and consumer products that the average consumer would see on the shelves of local convenience stores and markets. Plaintiffs' customers are largely made up of those retail stores, as well as other small, independent wholesalers, both groups of which purchase goods from Plaintiffs for resale. Plaintiffs' businesses cover both a "cash-and-carry" component (where retailers visit the business to make purchases directly) and a delivery/distribution component, where the goods are delivered directly to a customer's location.

### The Clear Eyes Product

32. Clear Eyes is a popular eye care product that helps eliminate redness and helps moisturize the eye. At issue in this case is the .2 oz "Pocket Pal" container for Clear Eyes, which is sold at tens of thousands of retail locations in the United States. This item is sold to the Plaintiffs and to Costco and Sam's in the same 12-unit "packs." The unit of sale to Plaintiffs and to the favored purchasers is either a single 12-unit pack, or sometimes four 12-unit packs bound together into a "case."

33. According to Prestige Brands' annual reports, in 2014 Clear Eyes held the number two market position in the eyedrop category, with a market share of 21%. By 2018, it has overtaken Visine, to hold the number one position in that category. Sales of Clear Eyes have grown approximately 100% over the last decade, currently approaching $100 million in annual sales.

34. All bottles of "Pocket Pal" Clear Eyes that are at issue in this case are of like grade and quality. There is no material difference between the product or configuration sold Plaintiffs, and that sold to their competitors Costco and Sam's Club.

35. Clear Eyes is sold and distributed in interstate commerce, across all 50 states, and around the world.

36. In selling Clear Eyes to wholesalers, Medtech sometimes offers the product directly, and sometimes uses a broker to whom it has granted the right to coordinate sales of Clear Eyes on its behalf. In the broker context, the broker does not buy Clear Eyes from Defendants and then re-sell it to Plaintiff. Nor does it ever take possession of the Clear Eyes that Plaintiffs purchase from Medtech, nor does it determine the price that different customers must pay to Medtech. Instead, all brokered sales of Clear Eyes must be approved by Medtech. All prices charged for Clear Eyes, including discounts, are set by Medtech; on information and belief the broker has no say in the matter.

### Medtech Has Discriminated Against Plaintiffs and in Favor of Costco and Sam's Club for Years

37. Medtech's price discrimination is seen from a simple comparison of the prices that it offered to Plaintiffs, with the prices at which Costco and Sam's Club offered Clear Eyes for *sale*. By way of example, on February 11, 2017, Medtech invoiced Plaintiff L.A. Top for its purchase of 350 4-pack cases of Clear Eyes at a price of ▮, or ▮ per 12-pack. On August 14, 2017, in contrast, L.A. Top was able to purchase 360 cases from Sam's Club in Southgate, California at $53.28 each, or $13.32 per 12-pack.

38. Similarly, on March 31, 2018, Medtech invoiced Plaintiff L.A. International for 1,400 12-packs of Clear Eyes at ▮ per pack. In contrast, L.A. International was able to contemporaneously purchase identical packs of Clear Eyes from Costco at a price of just $11.99 per pack, via a $3.00 manufacturer rebate from Medtech. With that rebate, Costco realizes a ▮ more favorable price than that which is given to the Plaintiffs in this case.

39. Medtech regularly offered Costco such ▮ rebates. Those rebates are calculated as ▮ of Costco's typical list price for a box. In contrast, Medtech never offered any manufacturer rebates to Plaintiffs on their sales, let alone rebates of ▮ of their sales price.

40. Each of the other Plaintiffs in this case was offered, and paid, similar pricing on its direct purchases from Medtech; most commonly ▮ per pack. Occasionally, slight discounts were offered to Plaintiffs, but those discounts never approached even the sale-price at Costco and Sam's Club, let alone the price at which Costco and Sam's Club *purchased* Clear Eyes from Medtech. For example, the best price that Medtech offered to Plaintiffs was a June 30, 2018 "truckload" offer for ▮ per case, or $14.02 per pack. That deal was expressly limited to only a single order.

41. Costco does not sell its merchandise below its cost. For one thing, at least in California, it would be illegal for it to do so, under California's Unfair Practices Act, Bus. and Prof. Code Sec. 17043. To the contrary, Costco has margins ranging from 10-13%—a higher margin than family-owned wholesalers like Plaintiffs typically charge. Accordingly, on information and belief Costco's acquisition price for Clear Eyes is 10-13% lower than the $13.52 at which it typically sells Clear Eyes; or roughly $12.17 per pack. This is ▮ lower than the price that Medtech has typically charged Plaintiffs for their purchases during the same time period, or roughly ▮ price favoritism to Costco.

42. Plaintiffs are not certain of the margins at which Sam's Club typically sells its consumer goods, but as with Costco, it certainly does not sell Clear Eyes below its *cost*, which would be a violation of California law. But even if Sam's Club sells Clear Eyes at precisely its cost, its sell price of $13.32 per pack would mean that Medtech discriminates in favor of Sam's Club in at least the amount of ▮ per pack, or ▮ lower than Plaintiffs' acquisition cost directly from Medtech.

43. During the frequent periods in which Medtech offered ▮ manufacturer rebates on sales through Costco (which were not offered to any Plaintiff), Costco's sell price was $11.99 per pack. Since the ▮ rebate is paid directly to Costco, the effect is that the net price that Medtech charged Costco during these rebate periods was approximately ▮ per pack, which is ▮ lower than the price Medtech charged Plaintiffs, for discrimination of ▮ against Plaintiffs, and in favor of the Costco chain.

44. The wholesale industry is one of thin margins for family-owned businesses like Plaintiffs, including for products like Clear Eyes. These low margins are the result of the fact that wholesalers' retail-store and small-wholesaler customers are extremely price sensitive. Ironically—and contrary to popular perception—Costco enjoys a profit margin of 10-13% on the items it sells, which is

significantly higher than the margins that Plaintiffs can afford to charge. For Clear Eyes at least (if not for all of Costco's products) Costco is only able to enjoy that large of a margin because it purchases Clear Eyes from Medtech at discriminatorily low prices. If Plaintiffs were granted similar prices, they too would be able to enjoy such a significant margin, and would have sold not only a greater volume of Clear Eyes, but would have enjoyed higher profits on those increased sales.

45. Faced with a cost of goods for Clear Eyes that was 17.5-38% higher than that paid by their competitors Costco and Sam's Club, as a matter of mathematics Plaintiffs have been unable to compete with Costco and Sam's Club on Clear Eyes, and have accordingly lost hundreds of thousands of dollars (if not millions) in sales that they otherwise would have had in the absence of the discrimination.

46. Indeed, Plaintiffs have had numerous customers tell their employees that they were buying Clear Eyes from Costco instead of from Plaintiffs due to the lower prices charged by Costco. Plaintiffs could not match such prices, as doing so would require Plaintiffs to take a loss on selling Clear Eyes, which is not only economically suicidal, but is illegal in California.

47. Plaintiffs have also observed for themselves that their sales of Clear Eyes have declined over time—while, as noted, Clear Eyes' share of the eye drop market has been *growing*, such that Prestige Brands now celebrates the fact that it holds the number one position in the category. Plaintiffs have witnessed firsthand how this decline in their sales is due exclusively to Medtech's discrimination in favor of Costco and Sam's Club.

48. Medtech has kept its precise prices to Costco and Sam's Club secret from Plaintiffs. Indeed, even as this litigation progresses, Plaintiffs anticipate that Medtech will take aggressive steps (such as demanding an "Attorneys' Eyes Only" protective order), to keep Plaintiffs in the dark about the secret terms and deals that Medtech gave, and continues to give, to Costco and Sam's.

## FIRST CLAIM FOR RELIEF
### (Robinson-Patman Act, 15 U.S.C § 13(a))

49. Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

50. Medtech engaged in price discrimination against Plaintiffs by selling Clear Eyes to favored purchasers such as Costco Wholesale Corporation and Sam's Club at both list and net prices that are far lower than the prices that Medtech charged to Plaintiffs. The various discounts and rebates that were offered to Costco were not offered nor otherwise available to Plaintiffs. On information and belief, Medtech further engaged in indirect price discrimination by making monetary promotional payments to Costco in conjunction with Costco's sale of Clear Eyes, which promotional payments were never offered to Plaintiffs.

51. Medtech's price favoritism to Costco and Sam's Club was not justified by any cost savings it realized in conjunction with those sales. There is no difference in cost to Medtech from producing and shipping a pallet (or truckload) of Clear Eyes to Costco or Sam's Club than there is in producing and shipping a pallet (or truckload) of Clear Eyes to any of the Plaintiffs. Indeed, due to Plaintiffs' more flexible packaging, spoilage, and delivery terms, on information and belief Plaintiffs allege that Medtech's cost to supply Plaintiffs with Clear Eyes is lower than its cost to supply Costco and Sam's Club.

52. The effect of Medtech's acts of price discrimination has been to substantially harm competition between the giant chains Costco and Sam's Club, on the one hand, and the family-owned Plaintiffs on the other.

53. This price discrimination has in turn caused economic harm to the retail stores and small wholesalers who purchased Clear Eyes from Plaintiffs, because those stores paid (and continue to pay) more for that product than they would have paid if Medtech had not discriminated against Plaintiffs. Indeed, had Medtech complied with the law, the retail stores and wholesalers supplied by

AMENDED COMPLAINT
CASE NO. 2:18-CV-06809-DPP(MRWx)

Plaintiffs would have realized cost savings of roughly 17.5-38% per bottle on their purchases from Plaintiffs.

54. In turn, Medtech's price discrimination harmed end-consumers, who paid (and continue to pay) more for Clear Eyes (at least on the purchases they make from stores supplied by Plaintiffs and their small-wholesaler customers) than they would have paid if Medtech had complied with the law. Assuming rational market behavior, end consumers in those stores would have paid roughly 17.5-38% less for Clear Eyes than they actually paid in the presence of Medtech's discrimination.

55. Plaintiffs have been damaged by Medtech's discrimination through losing retail-store customers to Costco and Sam's Club, by their inability to attract new customers through price-competition with Costco and Sam's Club, by making lower profits on their existing sales, and by selling lower volumes of Clear Eyes than they would have sold in the absence of the discrimination.

### SECOND CLAIM FOR RELIEF
### (Robinson-Patman Act, 15 U.S.C. § 13(d))

56. Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

57. Medtech provided promotional payments, rebates, and/or services to Costco that it never offered to Plaintiffs, let alone on the "proportionally equal terms" required by section 2(d) of the RPA.

58. Plaintiffs have been and continue to be harmed by these discriminatory promotional allowances, rebates, and payments, both insofar as those promotions allowed Costco to attract additional sales, and insofar as those payments amounted to an indirect subsidy of the net price Costco paid for Clear Eyes.

### THIRD CLAIM FOR RELIEF
### (California Unfair Practices Act, Cal. Bus. & Prof. Code § 17045)

59. Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

60. The discounts, rebates, and other promotional allowances offered by Medtech to Costco and Sam's Club were secret and undisclosed to Plaintiffs. That is, as alleged above, Plaintiffs have never been told by either Medtech or its brokers that it grants a lower price to Costco and Sam's Club.

61. The effect of such price discrimination has been to substantially harm competition among Medtech's favored purchasers/wholesalers such as Costco and Sam's Club, and Plaintiffs, who directly compete with Costco and Sam's Club for sales of Clear Eyes to retail stores and small wholesalers.

62. This price discrimination has in turn caused economic harm to the retail stores who purchased Clear Eyes from Plaintiffs, and thus have paid, and continue to pay, more for Clear Eyes than they would pay had Medtech complied with the law. Thereby, consumers purchasing Clear Eyes from those stores are similarly paying higher prices than they would pay if Medtech had offered the same pricing to Plaintiffs.

63. Plaintiffs have been damaged by Medtech's actions, by having their customers purchase Clear Eyes from Medtech's favored purchasers/wholesalers instead, and/or by enjoying lower profits on their existing sales of Clear Eyes.

### FOURTH CLAIM FOR RELIEF
(California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200)

64. Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

65. Medtech's actions are in violation of the federal Robinson-Patman Act and the California Unfair Practices Act, and therefore constitute unlawful and unfair conduct within the meaning of California's unfair competition law.

66. Plaintiffs are entitled to restitution and injunctive relief under California's unfair competition law.

### PRAYER

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1. For judgment against Defendants Prestige Brands Holdings, Inc. and Medtech Products, Inc.;
2. For compensatory and treble damages;
3. For restitution to Plaintiffs;
4. For preliminary and permanent injunctive relief against the price discrimination alleged herein;
5. For attorneys' fees;
6. For costs; and
7. For such other and further relief as the Court deems just and proper.

Dated: August 20, 2018            GAW | POE LLP

                                  By: /s/ Mark Poe
                                      Mark Poe
                                      Attorneys for Plaintiffs

All Plaintiffs hereby demand a jury trial for their claims against Defendants Prestige Brands Holdings, Inc. and Medtech Products, Inc.

Dated: August 20, 2018             GAW | POE LLP

By: /s/ Mark Poe
Mark Poe
Attorneys for Plaintiffs