**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| L.A. INTERNATIONAL CORP., et al., | Case No. 2:18-cv-06809-MWF-MRW |
| Plaintiffs, | The Honorable Michael W. Fitzgerald, United States District Judge |
| v. | |
| PRESTIGE CONSUMER HEALTHCARE, INC., et al., | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendants. | Trial Date:          Dec. 5, 2023 |

This matter came on for trial between December 5, 2023, and December 14, 2023.  Plaintiffs are L.A. International Corp., Manhattan Wholesalers Inc., Excel Wholesale Distributors Inc., Value Distributor, Inc., Border Cash & Carry, Inc., AKR Corporation, U.S. Wholesale Outlet & Distribution, Inc., Sanoor, Inc. (d/b/a L.A. Top Distributor), Pittsburg Wholesale Grocers, Inc., and Pacific Groservice, Inc.  Defendants are Prestige Consumer Healthcare, Inc. (f/k/a Prestige Brand Holdings, Inc.) and Medtech Products Inc.

The legal issues (damages) were tried to the jury, and the equitable issues (injunctive relief) were tried to the Court.  The jury returned a special verdict in favor of Plaintiffs awarding damages.  (Docket No. 329).  The Court now **FINDS** and **RULES** in favor of Plaintiffs on their claims for injunctive relief.  The basis for these Findings of Fact and Conclusions of Law are as follows:

***First***, the Court's Findings and Conclusions must be consistent with the jury's verdict, or else the Court would invade the jury's role under the Seventh Amendment.  *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 473 (1962) (when legal and equitable issues are tried on the same evidence, the jury's determination must be first and is binding); *Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016) (so construing *Dairy Queen*).  The jury's answers to the questions on the verdict form can only be understood as a unanimous finding in favor of Plaintiffs' theory.

***Second,*** having carefully reviewed the record and the arguments of counsel, as presented at the trial and in their written submissions, the Court makes the following Findings of Fact and reaches the following Conclusions of Law under Rule 52 of the Federal Rules of Civil Procedure.  Any Finding of Fact that constitutes a Conclusion of Law is also hereby adopted as a Conclusion of Law, and any Conclusion of Law that constitutes a Finding of Fact is also hereby adopted as a Finding of Fact.

# I.   FINDINGS OF FACT

## A.   The Parties

1.   Plaintiffs are wholesale businesses that sell, among other merchandise, Clear Eyes Redness Relief eye drops in the Handy Pocket Pal container ("Clear Eyes").  (Final Pretrial Conference Order (ECF No. 301) at ¶ 5.1.)

2.   Four of the Plaintiffs are based in the Los Angeles area: L.A. International, L.A. Top, U.S. Wholesale, and Value Distributor.  Two Plaintiffs are based in the San Francisco area and do business together under the name "Pitco Foods":  Pittsburg Wholesale Grocers and Pacific Groserservice.  Three Plaintiffs are based in the New York City area:  AKR, Excel Wholesale, and Manhattan Wholesalers.  And one Plaintiff is based in San Antonio, Texas:  Border Cash & Carry.  (Final Pretrial Conference Order ¶ 5.2.)

3.   Defendants Prestige Consumer Healthcare, Inc., and its wholly-owned subsidiary Medtech Products, Inc. (collectively "Prestige") manufacture and distribute Clear Eyes.  (Final Pretrial Conference Order ¶ 5.3.)

## B.   Prestige's Sales of Clear Eyes

4.   Clear Eyes is a 0.2 ounce bottle that comes in paperboard boxes of twelve units, which the parties referred to as "display units" or "counter displays."  Four twelve-count boxes comprise a "case" of Clear Eyes.  Clear Eyes was sometimes sold and shipped in a pallet configuration, with (at different points) 70 or 81 cases to a pallet.

5.   Prestige sells Clear Eyes directly to Plaintiffs, typically by the case.  Among Prestige's other direct-purchasing customers of Clear Eyes are Costco Wholesale Corporation, and, since March 2017, the Sam's Club division of Walmart, Inc.  (Final Pretrial Conference Order ¶ 5.6–5.10)

6.   Costco operates two types of stores: the "regular" Costco stores, and a separate type called Costco Business Centers.  At all relevant times, Costco has sold Clear Eyes only through its Costco Business Centers. (*See* Final Pretrial

- 3 -

1    Conference Order ¶ 5.7–5.8).  As of the time of the trial, Costco operates four

2    Costco Business Centers in the Los Angeles area, three in the San Francisco area,

3    one in Sacramento, and one in Hackensack, New Jersey.  (Trial Tr. 12/6/2023

4    (Docket No. 358) at 467:22–468:5 (Amini identifying four Los Angeles area

5    stores); Trial Tr. 12/6/2023 at 271:2–11 (Luttway identifying three Bay Area stores

6    and one Sacramento store).

7         7.    Sam's Club currently operates multiple stores in the Los Angeles area,

8    one store in the San Francisco area, two locations in the New York City area, and

9    six stores in San Antonio.  (Final Pretrial Conference Order ¶ 5.11).

10        **C.    Prestige's Payments to Costco and to Plaintiffs for Advertising and**

11             **Other Promotional Services**

12        8.    Throughout the time period at issue in this action (August 2014

13   through the present), Prestige continuously made promotional payments to Costco

14   to support and facilitate Costco's sales of Clear Eyes.  Trial witness Jacob Grehn is

15   the Senior Director of Sales for Prestige who was responsible for its sales of Clear

16   Eyes to Costco. (Trial Tr. 12/8/2023 (Docket No. 362) at 829:24–830:3).  Mr.

17   Grehn testified that going back to 2014 or 2015, Prestige had made various types of

18   payments to Costco in conjunction with its sales of Clear Eyes, including

19   advertising payments, payments to participate in Costco's periodic "Instant

20   Redeemable Coupon" ("IRC") events, payments to appear in the "Business Savings

21   Event" flier that advertised the IRCs, and payments for advantageous product

22   placement.  (Trial Tr. 12/8/2023 at 859:6–12).  Mr. Grehn further testified that

23   Prestige would pay Costco for "e-mail blasts," "ad space," and to appear on

24   Costco's website.  (Trial Tr. 12/8/2023 at 859:16–25).  Mr. Grehn referred to these

25   as "promotional and advertising" payments.  (Trial Tr. 12/8/2023 at 860:1–4).

26        9.    Mr. Grehn testified that at some point in 2015, Costco rolled out what

27   it called the "DOW" program, which stands for "delivery, operations, and web

28   services."  (Trial Tr. 12/8/2023 at 860:5–10).  He explained that the "DOW

- 4 -

allowance" was intended to eliminate the piecemeal payments that Prestige and other vendors had previously made for advertising and promotional services. (Trial Tr. 12/8/2023 at 860:8–17).  Referencing Trial Exhibit 61 as an example of a DOW contract, Mr. Grehn explained that under the DOW program, Prestige makes quarterly payments to Costco for its various advertising and promotional services, and that the current amount of the payment is 3.95% of Costco's acquisition cost for Clear Eyes. (Trial Tr. 12/8/2023 at 860:23–861:9, 861:21-23; *see also* Tr. Ex. 61 at 2 (percentage based on acquisition cost)).

10.     In contrast to Costco, Prestige never offered to pay any of the Plaintiffs promotional payments for advertising or other services to facilitate their sales of Clear Eyes, and never offered them anything akin to a DOW allowance.  (Trial Tr. 12/6/2023 at 269:1–7 (Luttway); Trial Tr. 12/6/2023 at 461:23–25, 462:7–11, 465:1–6, 465:12–15 (Amini); Trial Tr. 12/7/2023 (Docket No. 360) at 561:14–20, 563:17–24, 565:2–7 (Wahidi); Trial Tr. 12/7/2023 at 631:14–15 (Rashidzada); Trial Tr. 12/8/2023 at 711:12–14, 712:10–12 (Kohanim); Trial Tr. 12/7/2023 at 771:3–5 (Nasafi); Trial Tr. 12/12/2023 (Docket No. 366) at 967:21-23 (Tursonzadah); 1017:18–22 (Sharifi)).  Prestige did not rebut that testimony, or otherwise identify any payments it had ever made (or offered to make) to any of the Plaintiffs in connection with their sales of Clear Eyes.

11.     No evidence was adduced at trial as to whether Prestige makes any promotional payments to Sam's Club to support its sales of Clear Eyes.

**D.     The Jury's Verdict**

12.     After receiving jury instructions and closing arguments, and after deliberating for approximately seven hours, the jury returned a verdict in favor of all Plaintiffs on their Section 2(a) RPA claims.  The jury further awarded antitrust damages in varying amounts to all Plaintiffs except Border Cash & Carry.  The jury also found in favor of the five California-based Plaintiffs (LA International, Value,

U.S. Wholesale, LA Top, and Pitco) on their Unfair Practices Act Claim, and awarded varying amounts of damages to each of those five Plaintiffs.

## II.    CONCLUSIONS OF LAW

### A.    Section 2(d)

13.    As the Ninth Circuit has recently explained:

Under [S]ection 2(d), it is unlawful for a seller to pay "anything of value to or for the benefit of a customer" for "any services or facilities furnished by or through such customer in connection with the . . . sale" of the products unless the payment "is available on proportionally equal terms to all other customers competing in the distribution of such products."

*U.S. Wholesale Outlet & Dist., Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1141 (9th Cir. 2023) (quoting 15 U.S.C. § 13(d)).

14.    Where, as here, an RPA plaintiff seeks only injunctive relief under Section 2(d), the court further explained:

To prevail on a claim for injunctive relief under [S]ection 2(d), the plaintiff must establish that it is in competition with the favored buyer, and "must show a threat of antitrust injury," but it need not make "a showing that the illicit practice has had an injurious or destructive effect on competition."

*Id.* at 1134 (citations omitted).

15.    The jury's verdict on the Section 2(a) claim necessarily means Plaintiffs were in actual competition with Costco, that the product was of like grade and quality, and that Prestige's sales to Plaintiffs and to Costco were reasonably contemporaneous.  (*See* Jury Instructions Nos. 17–20 (requiring Plaintiffs to prove each of these matters to prevail on their Section 2(a) claim)).

16.    The only remaining issues are whether (1) Prestige in fact made promotional payments to Costco that it did not make available to Plaintiffs on

"proportionally equal terms," and (2) whether depriving Plaintiffs of such payments threatens an "antitrust injury." *Id.* at 1134 (citation omitted).

17.     On the first issue, as recited above, the evidence is undisputed that Prestige pays Costco a 3.95% DOW allowance as a fund for advertising and other promotional activities, and that it provides no similar promotional funding to any of the Plaintiffs.

18.     On the second, an "antitrust injury" is merely an "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1273 (9th Cir. 2022) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).  Here, the deprivation of proportionally equal promotional payments constitutes an "antitrust injury" as proscribed by Section 2(d) of the RPA.

19.     Accordingly, the Court concludes that Prestige is liable for violating Section 2(d).

20.     There is one caveat.  Plaintiffs adduced no evidence of promotional payments that Prestige makes to Sam's Club and adduced no evidence that Plaintiff Border Cash & Carry is in actual competition with Costco (as opposed to Sam's Club) for sales of Clear Eyes.  Thus, Border Cash & Carry has failed to prove that Prestige violated Section 2(d) with respect to it.

### B.     California Unfair Competition Law

21.     Plaintiffs' fourth cause of action is for violation of the California Unfair Competition Law ("UCL"), California Business & Professions Code § 17200 *et seq.*  At summary judgment, Plaintiffs conceded that only the five California-based Plaintiffs can bring a claim under the UCL.  (ECF No. 176 at 21.)

22.     "The UCL broadly prohibits 'any unlawful, unfair or fraudulent business act or practice.'" *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 (9th Cir. 2011) (quoting Cal. Bus. & Prof. Code § 17200).  "By proscribing any unlawful

business practice, [the UCL] borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999) (internal quotation marks and citation omitted).  Therefore, the "unlawful" prong of the statute prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Id.*

23.     The Court's ruling on Plaintiffs' UCL claim is required by the jury's verdict.  *See U.S. Sec. & Exch. Comm'n*, 835 F.3d at 1112.  The jury concluded that Prestige unlawfully violated Section 2(a) of the RPA and the UCL, California Business & Professions Code § 17045.  And in these Findings of Fact and Conclusions of Law, the Court has concluded that Prestige violated Section 2(d) with respect to all five California-based Plaintiffs.

24.     Prestige is therefore liable for violating the UCL as to the five California Plaintiffs.  As with the Section 2(d) claim, the propriety and scope of injunctive relief for that violation is determined in the Order concurrently filed.

### III.   <u>CONCLUSION</u>

25.      The Court finds that Prestige has violated Section 2(d) of the RPA with respect to all Plaintiffs except Border Cash & Carry, and that Prestige has violated the UCL with respect to the five California-based Plaintiffs.

**IT IS SO ORDERED.**

Dated:  May 20, 2024

_____
MICHAEL W. FITZGERALD
United States District Judge

- 8 -